**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-80162-CR-CANNON**

**UNITED STATES OF AMERICA**

**vs.**

**JOSEPH ADDISON MARTIN, and**
**JOSEPH ROBERT STEWART,**

**Defendants.**
_____________________________________/

**GOVERNMENT'S SENTENCING MEMORANDUM AS TO DEFENDANT JOSEPH ADDISON MARTIN AND RESPONSE TO MOTION FOR DOWNWARD DEPARTURE OR VARIANCE**

**COMES NOW**, the United States of America, by and through its undersigned attorneys, and respectfully submits this sentencing memorandum as to Defendant Joseph Addison Martin and response to his motion for downward departure or variance. [ECF No. 63.]

Of the thousands of users of Website A, the defendant was one of the most powerful. In fact, he was approximately the third-highest-ranking member of the website. This level of authority on the website distinguishes him from all other Website A defendants who have been sentenced so far, other than William Spearman and Selwyn Rosenstein.

But this defendant is different than even Spearman or Rosenstein. There are numerous other aggravating factors establishing that he is an ongoing danger to the community and to children. For starters, the defendant enticed and persuaded a minor girl to produce child pornography and send it to him. As bad as this sounds, the details are even worse: the defendant had the minor girl engage in degrading and humiliating conduct for his own sexual amusement.

The defendant's child pornography collection is also vastly worse than any other Website A staff member who has been sentenced to date. It included ghastly depictions of the mutilation,

torture, and deaths of children. And the defendant engaged in other conduct that went beyond the internet. For instance, he admitted to the FBI that he stole a swimsuit designed for a 6-year-old girl so he could use it to fantasize and sexually gratify himself.

The defendant's Guidelines range is life imprisonment. Because he was not the very highest leader of Website A, however, the United States agrees that a modest downward variance from the Guidelines range is appropriate. But "modest" is the operative word here. The Court should impose a sentence that reflects the extreme seriousness of the defendant's offense conduct and the disturbing aggravating factors.

The government therefore respectfully recommends that the Court sentence the defendant to a below-Guidelines term of imprisonment of 50 years in prison. This sentence is fully justified by the 18 U.S.C. § 3553(a) factors, and it is consistent with the sentences this Court has already handed down to the defendant's co-conspirators.

## BACKGROUND

As the Court well knows, "Website A" was an online sanctuary for pedophiles and child predators. It was a private meeting place on the Dark Web for users to discuss and share material depicting the sexual abuse of infants and toddlers, violent and sadistic CSAM, and other material.

It was not a small and tight-knit group of offenders, either. For years, Website A provided a large and active community for thousands of offenders from around the world to explore their shared sexual interest in children, validate each other's conduct and destructive sexual impulses, share tips on how to abuse children and avoid detection, and embolden each other to escalate their behavior. Such a large and active community, of course, can never exist in the real world. It can only exist online, and in the darkest corners of the internet.

Website A could not have existed without the defendant and a small number of other

offenders. He was one of the founding members of the website and he provided service to it for years. He was one of the very last leaders of the website who remained unarrested when Website A entered its last days, and even then, he still sought to keep the website going.

He only stopped this activity in August 2023, when the FBI executed a search warrant at his home in Washington state and arrested him. After his arrest, a federal grand jury in the Southern District of Florida returned an indictment charging the defendant with engaging in a child exploitation enterprise, in violation of 18 U.S.C. § 2252A(g), and other counts. [ECF No. 13.] In December of last year, the defendant pleaded guilty with a plea agreement to engaging in a child exploitation enterprise.

## SENTENCING ANALYSIS

"In sentencing a defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.'" 18 U.S.C. § 3553(a)(4)(A). The Sentencing Guidelines are thus the appropriate starting point from which the Court exercises its discretion under § 3553(a). *See United States v. Crawford*, 407 F.3d 1174, 1178–79 (11th Cir. 2005). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

## I. THE APPLICABLE SENTENCING GUIDELINES

### A. The Accurately Calculated Guidelines Range Calls for a Serious Sentence

The U.S. Probation Office filed a final presentence investigation report containing the following Guidelines calculation:

| **Guideline** | **Offense Level** |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.6(a)); | 35 |
| Enhancement for victims under the age of 12 years (*id.* § 2G2.6(b)(1)(A)); | +4 |
| Enhancement for conduct described in 18 U.S.C. § 2241(a) or (b) (*id.* § 2G2.6(b)(3)); | +2 |
| Enhancement for use of a computer or interactive computer service in furtherance of the offense (*id.* § 2G2.6(b)(4)); | +2 |
| Enhancement for being a manager/supervisor of criminal activity involving more than five individuals (*id.* § 3B1.1(b)); | +3 |
| Enhancement for being a repeat and dangerous sex offender against minors (*id.* § 4B1.5(b)); | +5 |
| Reduction for demonstration of acceptance of responsibility (*id.* § 3E1.1(a)); | -2 |
| Reduction for timely notification of intent to plead guilty (*id.* § 3E1.1(b)).[1] | -1 |
| **TOTAL:** | **48** |

[ECF No. 65 ("PSR") ¶¶ 122-33.] The defendant's offense level is reduced to 43 because the Sentencing Table does not go up any higher than that. *See* U.S.S.G., Chapter 5, Part A. cmt. 2 (noting that a defendant's total offense level will exceed 43 only "in rare cases," and in such cases it should be treated as level 43). This calculation is accurate and reflects the facts underlying the defendant's offenses and his other relevant conduct. The PSR further places the defendant in Criminal History Category I, which results in a Guidelines sentencing range of life imprisonment. [PSR ¶¶ 136, 182.]

The PSR also correctly notes that the defendant is subject to a mandatory minimum term of imprisonment of 20 years, a mandatory minimum term of supervised release of five years, a maximum fine of $250,000 per count of conviction, a special assessment of $100 under 18 U.S.C. § 3013, a potential $5,000 special assessment under 18 U.S.C. § 3014, and an additional special

[1] If the Court determines that the defendant has accepted responsibility and is entitled to a two-level reduction under U.S.S.G. § 3E1.1(a), the United States moves to adjust the defendant's offense level downward by one level pursuant to § 3E1.1(b) for timely notifying the government of his intention to plead guilty.

assessment of up to $35,000 under 18 U.S.C. § 2259A. [*Id.* ¶¶ 181-92.] Finally, the defendant is required pursuant to 18 U.S.C. §§ 2259 and 2259A to pay restitution in the full amount of the losses that were incurred by any victims as a result of his child-pornography-related conduct. [*Id.* ¶ 193.]

**B. A Significant Downward Departure or Variance is Not Warranted**

The United States agrees that a *small* downward variance is appropriate in this case for one reason and one reason only: the Court sentenced William Spearman to life imprisonment for being the single highest leader of Website A, and this defendant played a marginally smaller role in Website A than Spearman did. The United States therefore recommends a below-Guidelines sentence to avoid a sentencing disparity with Spearman.

There is no other basis for a downward departure or variance from the Guidelines range. For starters, it is likely that the defendant's Guidelines calculation *understates* his culpability. While it accounts for several aggravating factors, it does not account for the fact that the defendant oversaw a massive, multi-thousand-user enterprise that lasted for approximately five years. And it likewise does not fully account for the true danger and insidiousness that arise from child pornography communities. In its 2012 Report to Congress, the Sentencing Commission made clear that online communities dedicated to child pornography and child sexual exploitation "allow child pornography offenders to connect with one another, commiserate about their marginalized status in society, and validate and normalize their sexual interest in children." United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at 92 (December 2012) ("2012 Report").[2] While not every member of a child exploitation

[2] The full report is available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

community has engaged in hands-on sex offenses against children, it found that the existence of such communities "increases the likelihood that *other* community members may engage in sex offending to create new child pornography images for trading online." 2012 Report at 94 (emphasis in original). The Commission found that such communities are also dangerous because they normalize the sexual exploitation of children, help offenders look at their deviant sexual desires in a positive light, and may lead offenders to progressing from viewing CSAM to committing other sex offenses. *Id.* at 97.

In fact, in its 2012 Report, the Sentencing Commission recommended that sentences in non-production child pornography cases should be primarily driven by three factors:

1. "the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);"

2. "the degree of an offender's engagement with other offenders—in particular, in an internet 'community' devoted to child pornography and child sexual exploitation; and"

3. "whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense."

2012 Report at 320. As explained in this memorandum, all three of these factors are highly aggravated in the defendant's case, and they make clear that he is a serious danger to the community.

Noting in the defendant's motion for a below-Guidelines sentence justifies a sentence lower than what the United States is recommending. For example, he claims that a downward

(last visited April 7, 2024).

departure is appropriate under the policy statement for "Mental and Emotional Conditions" in U.S.S.G. § 5H1.3. [ECF No. 63 at 2-3.] But the Guidelines contain a policy statement set forth in U.S.S.G. § 5K2.0(b), which makes clear that "child crimes and sexual offenses"—which include the offense under Chapter 110 of Title 18 to which the defendant pleaded guilty—are to be treated differently than other types of crimes. U.S.S.G. § 5K2.0(b) & App. Note 4(A). In such cases, the only permissible bases for a downward departure are those "expressly enumerated" in Chapter Five, Part K of the Guidelines Manual.

Even if there were a sufficient basis for a departure under § 5H1.3—and there is not—this provision is located in Part H of Chapter 5 and is absent from Part K. Accordingly, it is not a permitted basis for a downward departure in cases involving crimes against children. *See United States v. Reilly*, 662 F.3d 754, 758-59 (6th Cir. 2011) ("Neither a defendant's lack of prior criminal history nor his or her military service are enumerated in § 5K. Accordingly, although these considerations are permissible grounds of departure for other types of crimes, these two factors are specifically excluded from consideration for child crimes and sexual offenses.").

## II. THE 18 U.S.C. § 3553(A) FACTORS WARRANT A 50-YEAR SENTENCE

In this case, there are no factors that warrant more than a minimal variance or departure from the Guidelines range. In particular, § 3553(a)(1) provides that courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant in crafting a sentence. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. Section 3553(a) also instructs courts to

consider the need to avoid sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6). Careful consideration of these factors confirms that a sentence of 50 years is sufficient but not greater than necessary to achieve the purposes set forth in § 3553(a).

### C. <u>The Nature and Circumstances of the Offenses</u>

The final PSR provides a thorough overview of Website A and the conduct of the defendant and his co-conspirators. [PSR ¶¶ 11-108.] In short, Website A was a sprawling and complex criminal enterprise catering to pedophiles and enthusiasts of CSAM. Anyone who encountered it would have immediately understood that it was dedicated to the exchange of images and videos depicting the rape, abuse, and exploitation of minors. Users of the website—of which there were thousands—trafficked in large volumes of CSAM and discussed the sexual abuse of minors for years. [*Id.* ¶¶ 11, 23.] This high volume of activity was by design: the users who ran the site required other users to share CSAM in order to gain greater access to the site.

But Website A was more than just a website or a place to acquire CSAM. It was a flourishing community where offenders could come together, discuss their interests, share information, provide advice on how to avoid law enforcement, and normalize one another's sexual desire for young children. Offenders who gravitate to these sorts of communities are more dangerous than other trafficking offenders—like those who obtain their CSAM through more impersonal methods of distribution—because it is in these online communities where offenders validate their sexual interest in children "so that actual sexual contact with a child no longer seems as wrong" and the step from possession to production of CSAM no longer seems as drastic. *United States v. Klear*, 3 F. Supp. 3d 1298, 1304 (M.D. Ala. 2014). And, to make matters worse, the technology underlying Website A was designed to allow these offenders to engage in these activities anonymously but openly, and with a measure of assurance that their crimes would not

be detected. [PSR ¶ 11.]

All of this was possible because of the dedicated work of the defendant and the other staff of Website A, who facilitated CSAM offenses on a massive, global scale. The conduct and the concomitant harm the defendant caused was both real and significant.

The defendant did not join Website A halfway through its existence. To the contrary, he was one of the founding members of the website, having become involved with it in approximately 2017. [PSR ¶¶ 85, 93(a).] No other defendant who has appeared before this Court was involved with Website A before 2018—including William Spearman and Selwyn Rosenstein. [*Id.* ¶¶ 24, 31(d), 48, 62(d).]

The defendant maintained an exalted status for the next half-decade of Website A's existence. He was approximately the third-highest-ranking leader of the website. [PSR ¶ 85.] In this capacity, he and the three or four other highest-ranking members of the website—including Spearman and Rosenstein—gathered in an exclusive, leaders-only forum to make decisions about Website A's management, direction, and day-to-day operations. [*Id.* ¶¶ 85, 87, 93(a).] The defendant didn't just attend staff meetings; he planned and put together agendas for them. [*Id.*]

Website A featured one particular room that contained gargantuan amounts of child pornography for viewing and download. [PSR ¶¶ 16(f), 45(e), 88.] This room was highly exclusive, and before they could access it, Website A users needed to share large quantities of child pornography in other rooms on the website. One high-ranking staff member told the FBI that users needed to share a *gigabyte* of child pornography before being allowed to access this room. [*Id.*]

The defendant was the head moderator in charge of this room. In this capacity, he reviewed applications from Website A users who wished to access this room, and he controlled who could

and could not access it. [PSR ¶ 88.]

The defendant played other administrative-type roles on Website A as well. For example, he supervised and directed other Website A staff members, voted on promotions and demotions of other users, helped moderate Website A rooms, and blocked or muted users who violated the website's rules. [PSR ¶ 86.] His rank on the website was so high that he had access to the server running it, and he routinely backed the Website A server data onto his own personal devices. [*Id.*]

He shared child pornography with his fellow Website A pedophiles as well, including depictions of children as young as toddlers being sexually abused by adults. For example, he shared content depicting a naked prepubescent girl who appears to be between seven and nine inserting objects into her vagina and anus. [PSR ¶ 89.]

The defendant remained on Website A to the very end—even after the arrests of his former co-leaders, who he knew to have been "compromised." [PSR ¶ 90.] At the time Website A went down, the defendant was the highest-ranking leader remaining on the site.

It is difficult to image a profile of someone more committed to a child-exploitation community than the defendant. This was not a crime of opportunity or the result of a momentary lapse of judgment. To the contrary, the defendant's crimes took sustained planning, effort, and time, over the course of many years.

Although this Court must consider other factors beyond the defendant's offense conduct, this Court should nonetheless give significant weight to his activity on Website A at sentencing. *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court.").

**D. <u>The History and Characteristics of the Defendant</u>**

The defendant's history and characteristics also weigh strongly in favor of a sentence of 50

years.

He claims that he is a "first-time offender" who has "no prior criminal history." [ECF No. 63 at 5-6.] But it is also undisputed that he engaged in ceaseless criminal activity for as long as a decade or more. [*See, e.g.,* PSR ¶¶ 85-86, 93(g), (i).] He may have no previous convictions, but that is only because he has never been caught. Being talented at committing crimes without being detected is not a mitigating factor.

It is also clear that the defendant's sexually exploitative behavior toward children goes far past his conduct on Website A. Most significantly, the FBI recovered evidence of him engaging in the real-time exploitation of a girl who was 14 or 15 years old at the time. [PSR ¶ 97.] The defendant did not just persuade the girl to send him pictures of her naked body and genitals, although he did do that. He directed her to choke herself with a rope or belt, insert a curling iron into her vagina, place clothespins on her nipples and vagina, slap herself, and write things on her body, including the phrases "cum dump," "good slut," and "rape me" (with an arrow pointing toward her genitals). This conduct took place on multiple occasions, and the FBI found photos of it on his devices. [*Id.*] This conduct alone (which did not take place in the Southern District of Florida) would subject the defendant to a minimum of 15 years in federal prison. *See* 18 U.S.C. § 2251(a) and (e).

The defendant also admitted to the FBI that he began accessing child pornography websites on the dark web nearly half a decade before he helped establish Website A. And even after Website A ceased operating, he helped start and manage another child pornography website. [PSR ¶¶ 91, 93(g), (i).]

The child pornography that the defendant chose to consume is also nothing short of blood-chilling. The FBI uncovered more than 65,000 child pornography images and videos on his

devices, and nearly the same number of sexualized and exploitative images and videos of young people or cartoons depicting child sexual abuse. This content included depictions of the penetrative rape of prepubescent children, including infants and toddlers. [PSR ¶ 95.]

As horrifying as this content is, the defendant was clearly interested in content that went even further. The FBI discovered images and videos on his devices that depicted murdered, dismembered, and mutilated children, including children who had been subjected to extreme sexual violence. [PSR ¶ 95.] He also harbored videos depicting the genital mutilation of young girls as well as children being bound and sexually tortured. [*Id.*]

The FBI likewise recovered from the defendant's devices guides explaining how to groom and sexually abuse children without being caught. [PSR ¶ 95.] One of these advertised itself as a "step-by-step guide for practicing safe and fun sex with children!" It included detailed advice on how to hunt for and exploit children, including a section entitled "where do I find a child?" that contained the subtopics "single parents and moms with kids" and "babysitting, daycare and schools." The defendant also had another guide on the same topic that offered advice such as "2 to 4 years old – anal only," and "5 years old and up you can do it all." It contained detailed advice on how to prepare a child's orifices to be sexually penetrated, such as "When she is 3 years old you can easily fuck her ass (gently), but if you try to stretch it all one go you will hurt her." Given the other conduct in the PSR, it is clear that the defendant's interest in how to exploit children was not purely academic or fantasy.

The defendant's sexual desires toward children manifested in other offline ways as well. For instance, during the execution of the search warrant, the FBI found a child's swimsuit among the defendant's belongings. The swimsuit was designed for an approximately six-year-old girl. When the FBI confronted the defendant about it, he said that he stole it from his employer to use

it to masturbate and fantasize about the sexual abuse of children. [PSR ¶ 93(j).]

The defendant also did not stop any of this conduct on his own. For example, he continued committing child pornography offenses online even though he knew that his co-administrators of Website A had been "compromised" and almost certainly arrested. [PSR ¶ 90.] He tried to keep Website A running, and when he was unsuccessful, he then helped to create a new child pornography website to replace it. [*Id.* ¶ 91.]

The only conceivable explanation for this conduct is that the defendant harbors a deeply rooted sexual interest in children, and one that he cannot meaningful control. He told the FBI that he is sexually attracted to children as young as five years old. [PSR ¶ 93(d).] According to the PSR, he has been diagnosed with pedophilia and sexual addiction. [*Id.* ¶ 153.] This is of particular concern given that there is reason to believe the defendant is very tech-savvy and thus less likely to be caught in the future than the average CSAM offender. As outlined above, he is a sophisticated and likely experienced consumer of CSAM, which he parlayed into a leadership role on Website A. He understood the importance of using the Dark Web as a means to avoid detection and specifically cautioned other users on how to limit their exposure to law enforcement. He also took steps to conceal his criminal conduct from others. He is therefore far more capable than an average offender of continuing to commit online CSAM offenses without detection.

The defendant's history and mental-health conditions do not support a substantially below-Guideline sentence either. It is true that the defendant has faced some challenging and adverse life circumstances. But this does not come close to excusing—or even explaining—his decisions or his criminal behavior. Many people face similar or worse childhoods and conditions, and they do not spend half a decade managing a child pornography enterprise, do not consume images of tortured and mutilated children, and do not convince vulnerable young girls to degrade themselves

on camera. The defendant chose his actions, and his sentence should reflect that fact.

### E. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

It is beyond dispute that crimes involving the trafficking of CSAM are serious and warrant significant sanctions. As "[l]ong-term studies" have confirmed, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). The fact that the defendant's conduct of conviction does not involve him committing hands-on acts of child sexual abuse does not lessen the significance of his predatory and criminal behavior. Contrary to what some may suggest, trafficking in CSAM inherently involves the sexual abuse of children, even if no new contraband is produced. *See New York v. Ferber*, 458 U.S. 747, 759 (1982). In fact, as explained above, the defendant's community-building activity on Website A here very likely played a role in encouraging other users to escalate from possession to production of CSAM. Accordingly, far from being victimless, trafficking in CSAM "harms children in part because it drives production [of CSAM], which involves child abuse." *Paroline v. United States*, 572 U.S. 434, 439 (2014).

Trafficking in CSAM also results in perpetual harm to children who have already been sexually abused, all of whom are grappling with the indelible trauma caused by that abuse. *See id.* at 440. As another court noted, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759). Accordingly, "[e]very instance of viewing images of child pornography represents

a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *see also United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm" when offenders consume, receive, and advertise this CSAM. *Sherman*, 268 F.3d at 547-48.

In light of the very serious harm caused by the defendant's conduct—and the equally serious harm that would befall his victims if he were to recidivate—it is particularly important that this Court craft a sentence that provides just punishment. 18 U.S.C. § 3553(a)(2)(A). As the Eleventh Circuit has observed, "because punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be. The seriousness of a crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." *Irey*, 612 F.3d at 1206. The *Irey* court cited the Senate Report regarding this provision:

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

*Id.* (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

Put differently, punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion toward the sexual abuse of children. *See Gregg v. Georgia*, 428 U.S. 153, 184 n.30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)). In this sense, retribution is a particularly valid penological goal in a case like this one, where the defendant's crimes caused unfathomable harm to our society's most vulnerable victims.

This Court must also consider the need to "promote respect for the law" at sentencing. 18 U.S.C. § 3353(a)(2)(A). Congress enacted federal criminal laws targeting CSAM trafficking to address ongoing sexual abuse and victimization of children. S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43, 56. But this legislation and its later amendments are more than prophylactic measures. They reflect value judgments and the accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. at 43.

Against this backdrop, the defendant did not just violate federal law, he also transgressed universally recognized moral principles—specifically, the need to protect and nurture children and not to be titillated by depictions of their rape and abuse. Through his own conduct and the conduct that he facilitated through his administration and support of Website A, the defendant exploited thousands upon thousands of children and helped to revictimize them through the continued trafficking in material depicting their abuse. This Court should craft a sentence that appropriately expresses social condemnation of the defendant's crimes, captures the serious harm he has caused—including to his real-time victim—and promotes respect for the rule of law. The

government's recommended sentence of 50 years of imprisonment does all three.

### F. <u>The Need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public</u>

Both specific and general deterrence call for a significant sentence consistent with the Guidelines recommendation here. With respect to specific deterrence, the risk the defendant poses to children is immense. His crimes are easily explained by way of analogy: "How many people who collect baseball cards have also played the game (or would play, if given the opportunity)? In other words, do the things we collect reflect our fantasies and interests? An answer in the affirmative seems obvious." *Handbook of Behavioral Criminology*, p. 332, edited by Dr. Vincent B. Van Hasselt and Dr. Michael L. Bourke, Springer Intl. Publishing (2017). Here, the defendant collected cards in the form of sexually explicit images and videos of children. But when collecting and viewing this material, he was not simply fantasizing about expanding the list of images and videos he had viewed. Common sense instructs that he was viewing this material because he very much desired the opportunity to engage in the abusive sexual conduct he observed. And as the Supreme Court has noted, there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003). The defendant now fits squarely within that class. The sentence imposed must therefore protect the public and account for the specific danger he poses to minors.

More generally, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'" *Id.* (citation omitted). As the Eleventh Circuit noted in a similar case,

"[y]oung children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others." *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (quoting *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)). The same is true here. And given that "sentences influence behavior," it follows that "the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced." *Id.* For this reason, "general deterrence is crucial in the child pornography context." *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012) (quoting *United States v. Camiscone*, 591 F.3d 823, 834 (6th Cir. 2010)) (punctuation altered). In recognition of the importance of deterring both the defendant and others from engaging in this sort of criminal conduct in the future, the United States submits that a sentence of 50 years is appropriate.

### G. The Need to Avoid Unwarranted Sentencing Disparities and the Kinds of Sentences Available

The United States' 50-year recommendation is also consistent with the sentences this Court has handed down to the defendant's co-conspirators already. To date, the Court has sentenced five defendants for their involvement in the leadership of Website A. Only two of those defendants—William Spearman and Selwyn Rosenstein—played anything close to the role that the defendant played on Website A.[3] The other defendants—including Gregory Good, Matthew Garrell, Robert Boyles, and the soon-to-be sentenced Joseph Stewart—were lower-ranked and thus less culpable than the defendant.

[3] Another Website A administrator, Keith McIntosh, was also comparable to the defendant in terms of culpability. He has, however, not yet been sentenced or even indicted. He was recently arrested by the FBI for his involvement with Website A and charged by criminal complaint in this district, and is expected to be pending trial before the Court soon. *See United States v. McIntosh*, No. 9:24-mj-08152 (S.D. Fla.).

This Court sentenced Spearman to life in prison. Spearman and the defendant are in many ways comparable to one another. They both were among the very highest-ranking members of Website A, they both participated in decisionmaking for the website, and they both spent years dedicating a large portion of their lives to Website A. In fact, the defendant has factors that are more aggravated than Spearman's. For example, the FBI never obtained any evidence indicating that Spearman engaged in the real-time exploitation of minors, unlike the defendant. Spearman's child pornography collection, while violent and horrifying, was less violent and disturbing and also smaller than the defendant's. Spearman was also not a founding member of Website A, whereas the defendant was.

Nevertheless, the United States cannot ignore that Spearman played a more aggravated role on Website a than the defendant did. Spearman was the most powerful figure on Website A and the single person most responsible for its operations and management. His influence and impact on Website A was simply greater than the defendant's. The United States thus submits that the defendant should receive a somewhat lesser sentence than the life sentence Spearman received.

The United States believes, however, that the defendant should receive a substantially larger sentence than Selwyn Rosenstein, whom the Court sentenced to 28 years in prison. The two are highly comparable in terms of culpability for Website A. Rosenstein was the number two in command, and the defendant was roughly number three. They both spent years and years ensuring the success of Website A.

A few factors, however, distinguish the defendant as more culpable overall than Rosenstein. First, while Rosenstein engaged in some highly concerning behavior toward children, the FBI never found instances of him enticing a child to produce child pornography. That is simply not true for the defendant. And of course, the defendant's production of child pornography took

place on multiple occasions, was highly aggravated, and revealed his delight in humiliating and degrading a child. The defendant's CSAM collection reveals the same thing.

Second, the defendant clearly kept running Website A long after he knew that other co-administrators, including Spearman and Rosenstein, had been arrested. And even after that, he helped start and manage a new website dedicated to child sexual abuse. Rosenstein, who was the first Website A administrator to be arrested by the FBI, had none of these factors.

Finally, Selwyn Rosenstein was 69 years old when he was arrested. The Court's 28-year sentence is thus almost certainly an effective life sentence. The defendant, in contrast, is 33 years old. A sentence that would allow the defendant to spend decades of his life out of prison would therefore create a discrepancy with Rosenstein's sentence.

While the aggravating factors in this case are significant, a sentence of 50 years also accounts for the few mitigating factors that exist—most notably, the defendant's prompt acceptance of responsibility.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to 50 years in prison, followed by a lifetime of supervised release.

Respectfully submitted,

Steven J. Grocki
Chief
Child Exploitation and Obscenity Section

By: *s/Kyle P. Reynolds*
Kyle P. Reynolds
William G. Clayman
Trial Attorneys
U.S. Dept. of Justice, Criminal Division

Court ID # A5502872
1301 New York Avenue, NW
Washington, DC 20005
Phone: (202) 616-2842
Email: kyle.reynolds@usdoj.gov

Gregory Schiller
Assistant United States Attorney
Fla. Bar. 048477
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Phone: 561-209-1045
Email: gregory.schiller@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 8, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified.

s/*Kyle Reynolds*
Kyle Reynolds
Trial Attorney
U.S. Department of Justice, Criminal Division